# Nelson's Adm'x v. Kitchen Lumber Co.

Dec. 13, 1938.

W. R. HENRY and STEPHENS & STEELY for appellant.

H. H. TYE and TYE, SILER, GILLIS & SILER for appellee.

Opinion of the Court by Judge Perry—Affirming.

The evidence shows that Jacob Nelson, while riding on a run-away logging train operated by the appellee, Kitchen Lumber Company, was thrown therefrom and killed when it wrecked.

This action was brought by his administratrix in the Whitley circuit court to recover damages in the sum of $3,000 for his death, alleging that her intestate, Jacob Nelson, was by the permission and orders of the defendant company and its agents being carried and transported, with other men and employees, on its logging train to the scene of work, when the defendant, its agents and employees, so negligently, carelessly, and recklessly managed and operated its said train as to cause the flat car on which plaintiff's decedent was riding to leave the track, thereby hurling him to the ground with such force and inflicting such injuries upon him that he did then and there die; that her decedent was either a servant or employee of the defendant before boarding said train and was being transported to his work, or he was on the train by permission of the defendant and would have been given work and employment at the scene of the work; that one or the other is true, but which is true the plaintiff does not know and cannot state. Further, she alleged that her decedent was killed by the negligence of the defendant company and its agents and employees as a result of which decedent's estate has been damaged in the sum of $3,000, for which she prayed judgment.

Jacob Nelson, at the time he was killed in this accident, resided at Saxton, Whitley County, Kentucky,

about three miles north of Jellico, a town lying on both the Kentucky and Tennessee sides of the interstate line.

The appellee, Kitchen Lumber Company, defendant below, at the time operated a saw mill at Oswego, Tennessee, about three miles south of Jellico. It also operated a logging railroad about twenty miles in length, the first six miles of which lie in Tennessee and the last fourteen miles of it in Kentucky. This railroad passes over the top of Jellico Mountain.

On the Tennessee side of the line, it is what is known as a "switch-back" railroad, running in zig-zag lines to the top of the mountain, then a short distance along its top to a power house, where the log cars are transported up and down the mountain on an incline, the empty log cars being let down the mountain on a rope while the loaded cars are at the same time drawn up. The logging train is usually made up of ten cars.

On the Tennessee side of the mountain the engine crew pushed up to the top of the mountain ten empty cars and brought down ten loaded cars. At the foot of the incline on the Kentucky side of the mountain another engine and crew brought down the loaded log train and took the empty cars back up Jellico Creek. Two or three men operated the incline.

At the head of the logging road, the Kitchen Lumber Company maintains a camp in charge of a superintendent.

The deceased, Nelson, formerly lived in Breathitt county and it is stated that he was experienced in logging and in the use of skiders and logging machinery.

Several months before his death, he, with his kinsman, William Huddleston, had gone to the mill, where it is stated he had applied to Mr. Miller, the chief officer of the company there, for a job, when he (Huddleston) heard Mr. Miller tell him that he "didn't have no job at that time."

On Saturday, May 16, 1936, two days before he was killed, Nelson went with the witness Meadows to Jellico, where, in the presence of Meadows, he called up the Kitchen Lumber Company at Oswego and talked to a man whom he called Mr. Miller and asked him whether they were ready for him, and when concluding this phone talk, Meadows heard Nelson tell Miller, "I will be there Monday morning in time to work." Witness, when

asked if he heard Nelson call the person to whom he was talking by name, answered, "I heard him say Mr. Miller."

The further evidence of the plaintiff on this point is that on Friday, the day before having this telephone conversation, the deceased had quit work at the mines at Ashton, where he had been employed, and had reported to his family that he was changing work and was taking a job with defendant lumber company on the following Monday morning; that he had asked them to pack his grip with his needed work clothes, as he was going to start about three o'clock Monday morning, so as to get to the logging camp on time.

While on his way from the mill to the logging camp in the woods, Nelson was killed in a run-away wreck of the logging train on which he was riding.

The next witness called was Doc Chitwood, one of the company's engineers, who ran the engine from the mill, taking the empty cars up the switch back track to the top of the mountain. He testifies that he saw Nelson on this Monday morning in front of the company offices and that he rode on his logging train to the top of the mountain, but that he did not talk with him. When asked if the employees of the Kitchen Lumber Company "ride on the train into the woods as far as you go," he answered, "sometimes, but hardly ever." When further asked, "If on that particular morning or any morning during last May * * * employees of the company didn't ride that train and if they don't ride that logging train from the mill to the woods * * * they do, don't they?" he answered, "They ride sometimes."

Robert McGuire, the next witness and engineer of the connecting train, operating between the foot of the mountain at the end of the incline and the logging camp in the woods, stated that he had brought in that morning (Monday, May 18) ten flat cars loaded with logs; that when he reached the foot of the incline, he found Jacob Nelson there with Dewey King, who stayed at the foot of the incline; that while they were getting ready to make the return trip, Nelson assisted in coaling up the engine; that Nelson had a black valise and told him that he was going to the head of the road; that on the return trip, the engine took all ten of the empty flat cars, pushing all of them in front of it; that Stephens, the brakeman, coupled together the cars and *was sup-*

*posed to have coupled the ten cars to the engine,* at least, he gave the engineer the signal to go ahead; that at the foot of the incline, the road bed was level, and when McGuire started his engine moving out slowly and had gone about 150 feet, a part or all of the empty flat cars had reached the down grade on the road and McGuire discovered that the ten flat cars were not coupled with his engine and that they were pulling away from it; that upon discovering this he at once blew the distress signal, calling the attention of the brakesman riding on the cars, who, upon looking back and seeing the cars were separated from the engine, set the brakes on the first car and maybe the second, when, doubting that he could check the speed of the flat cars, he jumped off. He testifies that Nelson, on the other hand, kept his seat on the flat car he was riding, and rode the run-away cars two or three miles to the foot of the hill, where the road made a sharp turn to go up Jellico Creek, at which point the cars wrecked and Nelson was immediately killed.

Further testimony, given by McGuire, is as follows:

"Q. On this 15 miles of logging road did the employees of this company ride this logging train? A. Yes, they rode the logging train backwards and forth.

"Q. Did your train—this logging train—from time to time, not only haul employees to and from the working place, but also haul passengers there for the purpose of getting employment? A. Well, lots of fellows rode. I don't know what they were going for.

"Q. Did some of the men going have bags of clothing—grips such as this man did? A. Yes, I have seen them go that way.

"Q. Usually what time did they ride? A. On Saturdays mostly.

"Q. Did many or few people ride this logging train from time to time—people who didn't have a regular job? A. Well, I have seen instances when they would bring up men that I don't think were working.

"Q. Did you ever know of any of them being put off? A. No, I never knowed of anybody being put off.

"Q. Was the head man there where they stopped—he could see the men on the train? A. Yes, he was there.

"Q. How long had it been in that condition—and these facts existed? A. Of hauling men?

"Q. Yes. A. From time to time.

"Q. How long had you worked in that capacity before this accident? A. Around two years the first of this last August—

"Q. During that period of time which you worked this same condition existed as to men riding the trains on that road? A. Yes, I think it had. Best I know."

During the trial of the case, at the conclusion of plaintiff's testimony, she, by counsel, moved for leave to file an amended petition, which motion was sustained.

By the petition as amended, plaintiff alleged that at the time her decendent was being transported upon the defendant's train, he was either an employee of the defendant on his way to work or he was a prospective employee, seeking employment; that one or the other is true, but which is true plaintiff does not know. Further, she alleged that it had long been the habit and custom of the defendant company to transport and carry both employees and prospective employees on its logging train to the camps where they would work or obtain positions to work, and that such custom was for the mutual benefit and convenience of the employees and prospective employees and the defendant company, and that her decedent was at the time and place mentioned in her original petition an invitee upon the train of the defendant.

By agreement of parties, the affirmative allegations of the petition as amended were ordered controverted of record.

Thereupon, the defendant, by counsel, moved for a peremptory instruction, which motion was sustained, and the jury peremptorily instructed to find a verdict for the defendant, which was accordingly returned, when it was adjudged that plaintiff's petition be dismissed and that defendant recover its costs.

Dissatisfied with this verdict and judgment, the plaintiff has appealed, asking their review.

The one question here presented, it is agreed, is, whether Nelson, when riding on the logging train of the defendant lumber company, was an employee or an invitee, or, as insisted by appellee, but a trespasser or a bare licensee.

The evidence clearly was insufficient to show that the deceased had been promised a job or was in any wise employed by the defendant company. It goes no further than to show that some months prior to this time, the decedent, with his kinsman, had gone to the Miller Lumber Company camp seeking employment, but was then told that they then had no job for him.

To establish Nelson's status as an employee it is further testified by his kinsman, Will Meadows, that on the Saturday before he was killed (on Monday, May 18) when riding on the company's logging train, he had gone with the deceased to Jellico, where Nelson had telephoned to the defendant's mill at Oswego in reference to his getting employment with the defendant. Witness testifies as to the outcome of his application for work only that he heard him talk over the phone to a man he called Mr. Miller, and concluded his talk with him by stating that ''he would be there Monday morning in time for work.''

Of course, the testimony as to what the decedent had been heard to say to members of his family, about having quit the mines and his going to work for the defendant, was self-serving hearsay and not competent to establish the fact that he had been employed by the defendant company or by the man whom the decedent had called Mr. Miller, as its agent and officer, during the telephone conversation. Also, the allegations of the petition and amended petition are that the deceased was at the time he was killed, when traveling over defendant's logging train to its logging camp, either an employee or prospective employee or an invitee upon its train, but that plaintiff could not say which was true.

The answer denied all of these allegations of the petitions, leaving the burden upon the plaintiff to establish by substantial evidence, as the basic requirement of the validity of her claim, not only that her decedent was killed by the negligence of the defendant's agents in the operation of its train when he was being transported by it, but that he was then an invitee or employee of the

defendant, when by reason of such relationship, either that of an employee or invitee, it owed him the duty of exercising ordinary care in the operation of its logging train to protect and safeguard him against injury while riding thereon.

The evidence of McGuire is to the effect that it had been a custom of the company from time to time to haul or transport upon its logging train its employees in going from the mill to its logging camp at the end of its road, some fifteen or twenty miles beyond on the mountain top; also, that some had ridden on his train as did the deceased upon this occasion, when he didn't know whether or not they were employees, but that, so far as he knew, no one, whether an employee or one riding on his train to the logging camp seeking employment, had ever been put off of the train.

In other words, the defendant's engineers, in charge of the operation of its logging train, state that they saw on the occasion in evidence the decedent get on the train with his grip, but did not know whether he was then an employee of the company or what was his relationship to the company—but nevertheless permitted him to ride.

There is no evidence tending to show that the company was attempting to employ the decedent, but all the evidence bearing on that point is to the contrary and that the decedent was job-hunting and had both months previously and also on the prior Saturday gone to the company's plant or telephoned it, seeking to secure employment with the company, and it appears that he was again going upon such personal mission to the lumber camp on the day he rode the defendant's train and was killed.

Such being the showing of the evidence, that the deceased, when killed, was riding on the defendant's train upon his own rather than the company's business and not upon its invitation given him, either as its employee or prospective employee, to come on its train to its logging camp, it is our conclusion that appellant's case was not brought within the mutual advantage doctrine.

The defendant, it would appear, both reasonably and properly contends that, inasmuch as the appellant has failed to show the decedent was either an invitee or an employee of the company when killed, upon the assumed existence of such relationship she bases her claim

and allegation that the defendant owed decedent the duty of exercising ordinary care in the operation of its train, to guard against his being injured when riding thereon, he at most was a bare licensee, riding upon the train with the tacit consent or acquiescence of the company's agents then in charge, to whom, as such, it owed no duty except not to willfully, or by the wanton or willful negligence of its agents, injure him.

It further contends that when decedent entered upon its train, not operated as a passenger train but only as a logging train, he took, as a bare licensee, the risk incident to his transportation thereon, to whom the company did not owe the affirmative duty of exercising ordinary care in the operation of its train, nor was it liable for the negligence of its agents, short of their willfully injuring him.

The rule as to the liability of a railroad company for personal injuries alleged to have been caused by its negligence in the equipment, maintenance or operation of its road is, as in the case of negligent injuries generally, dependent on its failure to exercise care or discharge a duty.

As said in 22 R. C. L. 915, section 163:

"In all the operations of a railroad, the invisible corporation, though never actually, is yet always constructively present through its acting agents, who represent it, and whose acts, within their representative spheres, are its acts, and in determining the liability of a railroad company for the acts of its servants in the operation of its road the general principles governing the liability of an employer for the torts and negligence of his employee are to be applied. A railroad company is not bound to consider the interests of a naked trespasser in the selection of its servants or in the performance of its business in any way. But, notwithstanding this distinction, the law, out of regard for common humanity, will not permit a master to allow his servant to abuse or imperil unnecessarily the life or limb even of a trespasser, and it is well settled generally that a railroad company is responsible in damages to a trespasser for torts committed upon him by a servant who, in the commission of the tort, is acting in the line of his employment and within the scope of his authority. * * * *" Also, see to like ef-

fect Louisville & N. Railroad Company v. Collins, 2 Duv. 114, 87 Am. Dec. 486.

Further, the language of section 164 of the same volume, entitled "Trespassers or Bare Licensees," is as follows:

"It is the generally accepted rule that a railroad company owes no duty to a trespasser or bare licensee on its premises except after discovering his peril; that is to say, there is no duty owed to such persons except to abstain from willfully or wantonly injuring them. There is no affirmative duty of care, and such persons must take the premises as they find them."

Cited in support of the text in footnote 19 to this section are the following cases: Cincinnati, N. O. & T. P. Railroad Company v. Marrs, 119 Ky. 954, 85 S. W. 188, 27 Ky. Law Rep. 388, 70 L. R. A. 291, 115 Am. St. Rep. 289; Louisville & N. Railroad Company v. Bays' Adm'r, 142 Ky. 400, 134 S. W. 450, 34 L. R. A., N. S., 678; Burbank v. Illinois Central Railroad Company, 42 La. Ann. 1156, 8 So. 580, 11 L. R. A. 720.

See also the case of L. E. Meyers' Company v. Logue's Adm'r, 212 Ky. 802, 280 S. W. 107, for a discussion of the distinction between the status of an invitee and that of a mere licensee and the difference in the resulting liability of the owner of premises toward one coming upon his premises as an invitee or a bare licensee.

It is also to be here noted that there is no question as to the defendant company's having failed in any duty arising upon its discovery of the deceased being in a place of danger on its run-away cars or that it failed to exercise all the means then at its command to avert injury to him.

It is therefore our opinion, after a very careful and full consideration of the entire record, that the trial court did not err in here sustaining, at the conclusion of plaintiff's evidence, defendant's motion for a peremptory instruction to find a verdict in its favor, in view of the plaintiff's having failed to establish that the deceased's relationship to the defendant company was other than that of a bare licensee, riding upon the defendant's logging train solely upon a purpose and mission of his own.

Judgment affirmed.